UNITED STATES of America, Plaintiff,

v.

Richard E. RIGGIN, Defendant.

No. IP 89–14–CR.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 20, 1990.

James M. Warden, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff.

James Brand, Greenfield, Ind., for defendant.

## ENTRY ON DETERMINATION OF MENTAL COMPETENCY TO STAND TRIAL

TINDER, District Judge.

This matter comes before the court for a hearing pursuant to 18 U.S.C. § 4241 to determine the competency of the defendant. On December 14, 1989, the court had ordered that the defendant be examined pursuant to the provisions of 18 U.S.C. §§ 4241(b) and 4247(b) so that a determination could be made as to whether the defendant is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The court ordered this examination *sua sponte* for reasons which will be discussed below. The defendant was committed to the custody of the United States Attorney General for purposes of having the appropriate examinations conducted. In accordance with that commitment, the Department of Justice had a thorough examination conducted of the defendant at the Federal Medical Center near Rochester, Minnesota. The results of that examination were compiled into a written report which has been filed as a part of the record in this case. Following receipt of

the report, the court held a hearing on February 28, 1990, to consider the report and any additional evidence and arguments from the parties. The court now makes its factual findings and conclusions of law with respect to the defendant's mental competency to stand trial.

## FACTUAL BACKGROUND

1983 was a very bad year for Richard Riggin. In July of that year, Mr. Riggin was terminated from his fulltime employment as an associate professor in the department of finance at Ball State University in Muncie, Indiana. His woes compounded in December of that year when a business he was operating called The Country Collections, also located in Muncie, was destroyed by a fire.

Mr. Riggin believes that the termination of his employment at Ball State was improper. Some of the civil litigation that he initiated in the Indiana State court system continues to this day. That litigation has taken on a variety of forms and has proceeded from the trial court through the appellate process. One of his cases is currently back in the trial court for further consideration. Not only does Mr. Riggin firmly believe that his termination was wrongful, he also believes that the Indiana judicial system did not properly process his case.

Somewhat like the controversy connected with his termination from Ball State, some matters related to the destruction of Mr. Riggin's gift and home decorating store remain at issue to this day. The contents and leasehold improvements of the Country Collection's business was insured with the Auto–Owners Insurance Company. The federal grand jury in this district has alleged in this case that Mr. Riggin, in February of 1984, committed two acts of mail fraud and one act of wire fraud in violation of Title 18, U.S.C. §§ 1341 and 1343 respectively. The gist of these charges is that Mr. Riggin is alleged to have submitted false purchase receipts to the Auto–Owners Insurance Company. The government contends that the receipts submitted by Mr. Riggin overstated the value of the invento-ry destroyed by the fire. The charges are brought in three separate counts in an indictment returned on February 2, 1989.

On August 24, 1989, shortly before the scheduled trial date of August 28, 1989, Mr. Riggin petitioned this court to enter a plea of guilty to count two of the indictment, the wire fraud count. On August 25, 1989, a hearing on the petition to enter a plea of guilty was held. The defendant's constitutional rights were explained to him at the guilty plea hearing and he was informed of the elements of the wire fraud statute, including the requirement that the government prove that the acts alleged in the wire fraud count of the indictment were committed as part of a scheme to defraud or for the purposes of obtaining money. The defendant was carefully questioned about his understanding of his rights and the charge, including the elements of the crime alleged. The defendant expressed an understanding of these things and offered a plea of guilty to count two. It should be noted that during this hearing the defendant recited his educational background which includes a bachelors degree from Ball States University, a masters degree in Business Administration from Indiana University and a Ph.D. in Business and Economics and university management from Indiana University. The guilty plea was accepted and a presentence investigation report was ordered.

The following chain of events in connection with the presentence report led to the court's order of a mental examination for this defendant.

As a part of the presentence report, the probation officer preparing the report, Mr. John D. Baker, conducted an interview of the defendant. The purpose of the interview was so that the probation officer could obtain the defendant's version of the offense to include in his report. Mr. Riggin provided his version of the offense, including a number of statements which tended to contradict the guilty plea previously offered to the court. For example, Mr. Riggin announced to the probation officer that he had done the acts alleged in count two of the indictment, but that his

intent was not criminal. Mr. Riggin indicated that he had devised a plan to submit altered purchase invoices to the insurance company which would result in the matter being brought into the federal court system. He stated that this was part of his plan to expose the various injustices he alleges that he suffered at the hands of the Ball State administration and the Indiana judicial system. Mr. Riggin further indicated that he did not obtain any money or compensation from the insurance company, but rather, he hoped to obtain a forum in which he could expose the wrongs he suffered.

Subsequently, counsel for the defendant moved to continue the sentencing hearing in order to complete preparation for the sentencing. The court granted this motion. Still later on December 12, 1989, the defendant, through his counsel filed a motion for leave to withdraw the previously tendered plea of guilty. The defendant contended, both in that motion and in an accompanying affidavit, that he did not understand that by entering the plea of guilty to count two of the indictment that he was admitting that he intended to defraud and obtain money by false and fraudulent representations from the Auto–Owners Insurance Company. A hearing on the motion to withdraw plea was held on December 14, 1989. The defendant testified at this hearing and essentially reiterated what he had previously told the probation officer. Mr. Riggin also repeated his lack of understanding that a plea of guilty was an admission that he had attempted to obtain money by false or fraudulent pretenses.

The defendant also submitted a report from a Dr. Iver F. Small, a psychiatrist who had examined Mr. Riggin in October of 1989. Certain portions of the report highlight the dilemma facing this court, and are set forth verbatim below:

Up to the time of his firing, Mr. Riggin was a fairly competent man. A professor, one who worked for the family and made decisions for an extended family who have business to conduct.(sic) Since the firing he has been consumed by this event, has spent most of his waking hours planning litigation and has spent his savings, his inheritance and his wife's inheritance. He now lives on the largesse of his relatives. He cannot reasonably discuss his legal affairs. For example, he will not recognize the possibility of losing a lawsuit.

In other areas Mr. Riggin is different. He is oriented, has a good memory, understands current events. He is aware of the ups and downs of life, even how bad things happen to good people and can't be helped or remedied. He understands his position in the community and the relationships he has with friends, families and others.

Dr. Small concluded that Mr. Riggin suffers from a rare form of "Paranoid Personality Disorder". He further considered that Mr. Riggin may be suffering from delusional disorders of a persecutory type and further reported that Mr. Riggin behaves in a rigid, inflexible way and that he does seem to have the problem "querulous paranoia." Ominously, Dr. Small concluded his report by stating that there is no good treatment for this condition.

The petition to withdraw the plea of guilty was granted. Simultaneously, the court ordered the mental examination referred to above. The defendant was allowed to report on his own to the Federal Medical Center for this examination. The evaluation of Mr. Riggin at the Medical Center took place over a period of approximately twenty-eight days in December of 1989 and January of 1990. As indicated above, the written report of the Federal Medical Center was subsequently submitted to this court and copies were given to counsel for both parties.

Medical, psychological and psychiatric examinations of Mr. Riggin were conducted. The defendant later complained at the hearing on his mental condition that the psychiatric interview lasted only one hour. What the defendant did not realize was that he was under observation during his stay at the Federal Medical Center. Additionally, he was unaware that the consulting psychiatrist considered the observa-

tions and tests by others at the Medical Center.

Except for hypertension and an abnormality in the defendant's electrocardiogram, his medical examination was unremarkable. The psychiatric and psychological examinations, however, were more revealing.

The defendant was asked to explain his present circumstances, and it is clear that he gave a statement to the personnel at the Medical Center much like the statement he made to the probation officer. Riggin explained in great detail his feelings that he was unjustly treated in connection with his dismissal from Ball State University and in his subsequent litigation. The presentation was apparently both dynamic and documented.[1] In fact, the author of the Federal Medical Center report indicated that the defendant "is forceful in his verbal presentation. He has speeded-up speech, good eye contact, and leaves the impression one is listening to a presentation by legal counsel to a jury."

A large portion of the Medical Center report is a summary of Mr. Riggin's explanation of the legal wrongs he perceives have been done to him. Mr. Riggin used the psychiatric examination as an opportunity to further argue his perspective on his termination from Ball State. He made a consistent explanation of his activity which led to his indictment in this case:

> From his (Riggin's) perspective the only hope left for vindication was to get into the Federal courts to expose the "corruptness" of the state court system in Indiana. To this end, he stated that he has been willing to devote every penny he has, which includes his wife's inheritance, borrowing from relatives, and his own money, over a million dollars. "If necessary, I am prepared to go to prison to expose the corruptness of the system which has cost me my life." To this end

he states that he engaged in the behaviors in question regarding the insurance claims to intentionally get his case into Federal court to expose certain professionals and their practices.

According to the medical report, the defendant adamantly insists that he is competent to go to trial. The report indicates that Mr. Riggin can paraphrase the legal criteria for competency. In other words, Mr. Riggin is familiar with the requirements that he must be able to cooperate with counsel and aware of the charges against him.

The Medical Center found no incoherencies in the speech or reasoning of the defendant, with the proviso that one must accept the basic premise that Mr. Riggin perceives everything in terms of his having been wronged in his termination and subsequent litigation. The report indicates that Mr. Riggin is oriented to person, place and time and appears to have an excellent grasp of details and has an active memory of the different events that have happened to him.

The psychological testing did not show remarkable results. It is interesting to note an attempt was made to administer a Rorschach test. The attempt was unsuccessful because the defendant approached the test in a defensive manner and was deemed to be markedly evasive and using a great deal of repression and denial with respect to the test.

The psychiatric examination reflected that Mr. Riggin has suffered what was described as "a massive blow to one's self esteem." The psychiatric consultant felt that it was only natural that, as a result, the defendant would exaggerate trends and feel that retaliation against those who he believes have slighted or mistreated him is worth any price. The report concludes that these symptoms are likely to be found in a person with a personality disorder, but that

---

1. Riggin apparently provided copies of various documents related to his Ball State dismissal and subsequent litigation to the personnel of the Federal Medical Center. He had also provided some of the same documents to the probation officer. At the hearing on his medical condition, the defendant's counsel introduced a stack of papers almost three inches high consisting of thirty documents related to the Ball State and subsequent litigation matters. According to Mr. Riggin, the documents submitted to the court are in whole or in part the same documents that he submitted to the probation officer and to the Medical Center.

this condition does not indicate that the defendant is suffering from psychosis with some type of delusional system. In generally discussing a person suffering from this type of disorder, the psychiatrist wrote:

> These individuals are often seen as litigious and are insistent on achieving their rights under any and all circumstances. Unsatisfactory experiences in the judicial system tap in, and exaggerate, trends that are often kept within bounds until then, and lead to the initiation of many questionable legal actions. They are questionable because, although they may be just (and I as a psychiatrist cannot decide that) they lead to many adverse consequences to the person in question and would not appear to be done with good judgement (sic).

The psychiatric consultant recognizes Mr. Riggin's mental disorder as "Paranoid Personality Disorder" and attributes some unwise judgments on the part of Mr. Riggin to this condition. However, it is the opinion of the psychiatric consultant that the defendant does know the nature of the charges against him and that he can rationally and factually assist his counsel in his defense.

Another comment from the psychiatric report illustrates the dilemma facing this court in evaluating Mr. Riggin's mental condition.

> Mr. Riggins (sic) puts everyone into the position of either not complying with some standard of justice or as behaving unethically. Hence, if disciplinary action is not taken, the individuals either not reporting or failing to act are then guilty of misconduct. This process goes on in a seemingly endless string involving whoever gets involved. This includes his current judge, and current lawyer.

I am sure that many lawyers and judges are familiar with litigants who are of similar bent.

As indicated above, a hearing was conducted on the defendant's mental competency on February 28, 1990. The only evidence introduced was submitted by counsel for the defendant. This evidence consisted of some testimony by the defendant about his stay at the Federal Medical Center and his evaluation there and the introduction into evidence of the thirty-one documents related to the Ball State termination and subsequent litigation referred to above. The court questioned Mr. Riggin about what might happen if he is found to be not competent to stand trial. The defendant appeared to respond with an understanding of the procedures with respect to his competency and trial.

The government argued that the defendant is competent based on examination and his demeanor and presentation in court. Counsel for the defendant clearly differentiated between the defendant's understanding of the charges against him and his ability to assist counsel. The attorney for the defendant does not contest that the defendant is able to understand the charges against him. He does strenuously argue, however, that the defendant, because of his mental condition, is unable to effectively assist counsel in the defense of this case. He points to the insistence and adamancy of his client in focusing on the Ball State termination and subsequent litigation rather than the issues presented in the indictment.

Based on the foregoing facts, the court must reach a conclusion regarding the defendant's competency to stand trial.

## CONCLUSIONS OF LAW AND DISCUSSION

█ In determining whether a criminal defendant is competent to stand trial, the court must decide whether the defendant is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). To the extent that further explanation of this test is required, well settled law indicates that the question before the court is whether the defendant presently has a rational and factual understanding of the criminal proceedings and the ability to consult with his counsel with a reasonable degree of rational understanding. *See Dusky v. United*

*States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Application of these principles is, however, far from easy.

■ The statutes dealing with competency to stand trial do not indicate who bears the burden of proof in a federal competency proceeding. This is in contrast to the clear assignment to the defendant of the burden of proof with respect to the legal defense of insanity. 18 U.S.C. § 17. On principles of fundamental fairness and due process, courts have appropriately refused to place the burden of proving incompetency on the defendant. *See United States v. DiGilio,* 538 F.2d 972 (3rd Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Thus the burden of proving competence to stand trial would implicitly fall on the government.

Here the government relies on the proof contained in the report from the Federal Medical Center and the conduct and demeanor of the defendant in the courtroom to support its assertion that the defendant is competent to stand trial. To counter this, counsel for the defendant points to the conclusions of Dr. Small, and the confirmation of the personality disorder in the defendant by the examiners at the Federal Medical Center. Defense counsel also points to the defendant's courtroom behavior as indicative or symptomatic of the defendant's mental impediment, emphasizing the defendant's insistence on discussing the

details of his termination dispute and subsequent litigation when faced with the vastly different and apparently unrelated issues presented in this criminal suit. It should be noted that the defendant's opinions on trial strategy differ from those of his counsel. From all indications, the defendant went along with his counsel's presentation regarding the competency issue, but it appears to the court that Mr. Riggin disagreed with his counsel's assertion that he lacks competency to stand trial. Mr. Riggin has consistently maintained during both psychiatric interviews conducted on him that he believes that he clearly understands the charges against him and is able to assist his counsel in his defense. From the testimony and other statements made by the defendant at the competency hearing, it is the court's impression that Mr. Riggin was attempting to show the court that he is not incompetent to stand trial on these charges. In fact, it might be said that Mr. Riggin appears to welcome the opportunity for a trial on these charges, on the hope that he will be able to display (or perhaps re-display) his views on the Ball State matters.[2] Despite this apparent fundamental disagreement, Mr. Riggin cooperated with his counsel at the hearing and did not demonstrate any visible dissatisfaction with his counsel's presentation.

■ Counsel for the defendant does not contend that Mr. Riggin cannot understand

**2.** It is not clear to the court at this time how the Ball State matters will be relevant at the trial of these charges. In his presentations to the probation officer, the psychiatric interviewers and the court, Mr. Riggin appears to be asserting that he could not have intended to defraud the insurance company because his thoughts were dominated by the Ball State matters. He further contends that the actions he took in connection with the submission of the insurance claims were done solely to gain a federal forum for his grievances about the Ball State matters. Thus, he may be contending that the *mens rea* elements of the crimes charged are lacking. On the other hand, he may be trying to make out a defense of "necessity" (in other words, he was forced to violate the fraud statutes to avoid bringing about a greater harm).

First, many of the events referred to in the numerous documents submitted to the court relate to matters which occurred, or were discovered, subsequent to February of 1984. For

example, a great deal of the Ball State litigation occurred *after* February of 1984, the time of the crimes alleged in the indictment. It is difficult for the court to understand how events occurring after the alleged crimes could have any bearing on the defendant's intent at the time of the episodes alleged in the indictment.

Second, to the degree that he is trying to make out a "necessity" type defense, this would be of no avail if there were other legal means available to him. *See* 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 5.4(d)(5) (1986), and cases cited therein.

No motion before the court requires a ruling on the admissibility of evidence under either of these theories, and no ruling is intended. However, as indicated above, the relevance of the evidence reflected in the 30 exhibits submitted by the defendant during the hearing on competency is obscure, at best, at this point in the litigation.

the proceedings or the charges he is facing. His argument in support of a finding of incompetency focuses on the other branch of the competency standard, that is Riggin's ability to assist counsel in the defense. Simply put, defense counsel's argument is that Riggin's persistent and adamant focus on the Ball State matters inhibits his ability to rationally deal with the issues posed by these serious charges. The court is not unsympathetic to this plea. Undoubtedly counsel feels as critical of the judgment being exercised by his client in this regard as the Federal Medical Center psychiatrists were in their report. The court can easily imagine a scenario in the defense counsel's office in which counsel wants to discuss the government's allegations and proof and defenses that may appear to be more closely related, at least from his objective view, to these charges. In response, Mr. Riggin wants to discuss the Ball State matters. Such conferences must be equally frustrating for the lawyer and the client. Perhaps counsel feels that he has lost control over his client and as a result, his best advice is being ignored. Unfortunately, this may not be an unusual complaint. *See United States v. Holmes,* 671 F.Supp. 120 (D.Conn.1987) *aff'd,* 867 F.2d 1425 (2d Cir.1988). The ultimate choice of whether to follow a lawyer's advice belongs to the client, no matter how unwise the decision. *See United States v. Rigatuso,* 719 F.Supp. 409 (D.Md.1989) (cases and American Bar Association Model Rules cited therein).

 Without question, Mr. Riggin's fixation on the Ball State matter is a real phenomenon, and is not contrived or imagined by him in any way. Regardless of whether Mr. Riggin is right or wrong about any of the facts involved in the Ball State matter, the events surrounding his termination and litigation dominate his life. This is evident from his courtroom conduct and from his communications with the probation officer and the psychiatrists and other mental health professionals he has come into contact with in this proceeding. It is

equally apparent that such an obsessive focus can serve to impede intelligent and rational communication and understanding between attorney and client.

However, all of the qualified experts who have examined Mr. Riggin have carefully analyzed this obsession and have found it to be nothing more than a personality disorder as opposed to a mental illness or defect. They also agree that in all other things and in all other respects, Mr. Riggin appears to be rational and functioning, at least as well as average. This is consistent with the manner in which the most widely regarded classification system for mental disorders categorizes this condition. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* § 297.10 (3rd Ed.Rev.1987). As a general matter, a personality disorder is separate and distinct from a mental disease or defect, and thus, does not ordinarily constitute the basis of incompetency for purposes of a federal criminal trial. *See United States v. Rosenheimer,* 807 F.2d 107 (7th Cir.1986); *United States v. Fazzini,* 871 F.2d 635 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989).

In researching this matter, the court has been unable to locate any clear guidance from prior judicial decisions. A case was found which bears a superficial resemblance to this situation, but comparison is not exact. *See United States v. Blohm,* 579 F.Supp. 495 (S.D.N.Y.1983). In that case, a defendant was charged with mailing threatening communications to a United States District Judge and his clerk. Defendant Blohm, despite his attorney's best advice, insisted on maintaining that an alleged conspiracy among the threatened judge, former President Richard Nixon and professional golfer Arnold Palmer had doomed a civil suit involving a claim of copyright infringement that the defendant had litigated in the court of the threatened judge.[3]

*United States v. Blohm,* 579 F.Supp. at 497.

---

**3.** The key link in the imagined conspiracy was that all three individuals play the sport of golf.

Blohm persistently sought to introduce evidence about the unsuccessful civil suit and the imagined conspiracy in the criminal proceeding. He justified his assertion of this bizarre defense in the criminal prosecution by explaining that the criminal matter was merely an extension of the civil litigation. Blohm contended that he caused the bringing of the federal charge so that he could obtain "justice" on the matters involved in the civil litigation and expose the "golf" conspiracy.

Qualified psychiatric experts examined Blohm and found him to be reasonably normal in most respects, except when the subject of his unsuccessful civil suit was raised. At that point, rationality, as commonly understood, was replaced with an obsessive fascination with the terminated civil suit.

■ The district judge found Blohm to be sufficiently impaired to find him incompetent to stand trial. However, the impairment in that case clearly interfered with the communication between attorney and client. The defendant in *Blohm* suffered delusions which went well beyond an obsession with an unsuccessful civil suit. He also imagined that he was capable of remarkable physical feats. Without question, Blohm's impairment made it impossible for him to assist his counsel in the preparation of a defense. The record here does not show that this matter has reached that stage at this point. Although strongly focused on the Ball State matters, none of the evidence before this court shows that this defendant is likely to be incapable of rationally discussing this case with his attorney. The psychiatric evidence in the record before this court shows that Mr. Riggin is reasonably intelligent and capable enough of working with his counsel on this matter if he should choose to do so. None of the experts who have analyzed him have given the court a reason to believe that the defendant does not have the ability to focus on the issues of this case, nor the ability to discuss the important issues presented in this prosecution. Absent proof of that type, this court would be remiss to find Mr. Riggin to be incompetent to stand trial. A finding of incompetency to stand trial would require that Mr. Riggin be committed to the custody of the Attorney General for an additional period of time. 18 U.S.C. § 4241(d). Given Dr. Small's gloomy prognosis that there is no good treatment for Mr. Riggin's condition, there seems little point in requiring an additional period of psychiatric confinement for this defendant. This is especially true in light of the unanimous psychiatric assessment of the adequacy of the defendant's memory, alertness and competency to understand the nature of this case and to assist in his defense. The court's own observations of this defendant in the three hearings in which the defendant has participated are consistent with the psychiatric findings. Mr. Riggin appears to have at least an adequate ability to remember events and to express his thoughts. He expresses a recognition of the consequences of a trial in this case, and at least a moderate ability to communicate with his lawyer. From all appearances, he can hear and understand what his lawyer is saying to him. This court cannot compel Mr. Riggin to accept his lawyer's assessment of legal matters, and it can certainly not force him to follow his lawyer's advice. The best that the court can do is try to evaluate whether the defendant is capable of rationally understanding his lawyer and of reasonably communicating with him. To this point, all indications are that Mr. Riggin can do so.

Therefore, based on all of the evidence in this matter heard by the court, I now find the defendant to be competent to stand trial.

■ A ruling on competency is not a final adjudication. It is not uncommon that a defendant's condition can change through the course of a proceeding. The finding of the defendant to be competent here does not mean that a subsequent effort to have this subject reconsidered would fall on deaf ears.

In the final analysis, the preponderance of the evidence before the court at this time shows Mr. Riggin to be well capable of communicating with his counsel, and in rationally understanding the communica-

tions coming back to him from counsel. While he may not currently choose to follow whatever course his counsel would chart for the defense, there is no showing that he could not understand it.